IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DAMONT'A JONES,

                    Plaintiff,                                    OPINION AND ORDER

          v.
                                                                  17-cv-854-wmc

MICHAEL DITTMAN, SGT. DITTMAN,
C.O. FISHER, 3RD SHIFT SUPERVISOR
MILLER, SGT. JAUNKE, SGT. JAKUZS,
C.O. LERVIC, C.O. BRANDAL, SGT. LOCKE,
SGT. GARRY, C.O. 2 KRATZ, SGT. PETERSON,
RN NAVARRO, RN. DIETRICH, C.O. 2 CATLIN,
UNIT MANAGER HICKS, SGT. FREITOG,
SECURITY DIRECTOR WEBER,
SECURITY SEGOLOWSKI,

                    Defendants.

          *Pro se* plaintiff Damont'a Jones, a prisoner at Columbia Correctional Institution,

filed this lawsuit pursuant to 42 U.S.C. § 1983. Jones claims that defendants, 19 Columbia

employees, violated his constitutional rights with respect to their handling of his conditions

of confinement and medical care. While Jones's complaint is ready for screening as

required by 28 U.S.C. § 1915A, even construing its allegations generously and in his favor,

Jones's complaint must be dismissed for failure to state a claim upon which relief can be

granted.[1]

---

[1] Plaintiff also states a separate state law claim for defendants' refusal to take photographs of his
injury. However, in the absence of a federal claim or independent basis for exercising jurisdiction
over that claim, the court will follow its ordinary practice of dismissing that claim without prejudice.
*See* 28 U.S.C. § 1367(c)(3); *Burritt v. Ditlefson*, 807 F.3d 239, 252 (7th Cir. 2015).

ALLEGATIONS OF FACT[2]

Plaintiff Damont'a Jones was incarcerated at Columbia during the relevant time period. All 19 defendants are or were Columbia employees during the relevant time period: Columbia Warden Michael Dittman, Sergeant Dittman, Correctional Officer ("CO") Fisher, Third Shift Supervisor Miller, Sgt. Jaunke, Sgt. Jakuzs, CO Lervic, CO Brandal, Sgt. Locke, Sgt. Garry, CO 2 Kratz, Sgt. Peterson (L.P.), RN Navarro, RN Dietrich, CO 2 Catlin, Unit Manager Hicks, Sgt. Freitog, Security Director Weber, and Security Segolowski.

During the morning of July 26, 2017, Sgt. Dittman informed Jones that there were bugs on the hallway wall and door, and Jones informed him that he had seen bugs coming in from his cell window. Sgt. Dittman suggested that Jones ask the first shift sergeant to come and spray. That night, Jones instead asked third shift CO Fisher if he could spray the bugs because they were biting him. Fisher responded that he had to call his supervisor. Later that night, Jones followed up with Fisher, who told Jones that the third shift supervisor, Miller, was looking into getting some spray.

A few hours later (2 a.m. on July 27), Jones asked Fisher to call a lieutenant or captain, and Fisher agreed. About ten minutes later, Miller came to his cell, and Jones showed him the bugs in the hallway and his cell. Jones further asked for bug spray because the bugs were biting him. Miller said he did not have any spray, but he or Fisher would leave a note for the first shift. Apparently, however, neither Miller nor Fisher left such a

---

[2] In addressing any pro se litigant's complaint, the court must read the allegations generously, drawing all reasonable inferences and resolving ambiguities in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

note.

At about 6:25 a.m. that morning, Jones asked Sgt. Jakuzs if there was a note about the bugs, and Jakuzs responded, "no." Jakuzs nevertheless allowed Jones to clean his cell with disinfectant and glass cleaner. At 6 p.m. that day, Jones asked Sgt. Locke if maintenance was coming to spray his cell, and Locke responded that he did not know. At 7 p.m. that day, Jones asked CO Brandal the same thing, and Brandal responded that there was a note that maintenance had come, even though according to Jones, maintenance never came.

At 7 a.m. the next morning (July 28), Jones asked CO Lervic if there was a note or work order for his cell, and she responded, "no." Lervic further declined to call maintenance to ask them to come spray his cell, but she did agree to talk to a sergeant for him. Ten minutes later, Jones asked Sgt. Garry to call maintenance, and Garry said he would. Jones followed up at 10:40 a.m. with Garry, who told Jones he had not been able to get in touch with maintenance yet because they were busy. Garry asked to see the bugs and Jones's bites, and Garry commented that he had never seen that type of bug before.

At about 3:15 p.m. that same day, Jones was working in the main kitchen and asked CO Lervic if maintenance had sprayed his cell and hallway. Lervic said, "no," but then indicated that Sgt. Garry had called and made the request. At 4:50, Jones asked Garry the same thing, and Garry responded that in fact, he had not done so. At some point that day, Jones wrote a letter to Warden Dittman about the bug infestation and his inability to get help from his unit staff.

At about 6:50 a.m. the following morning (July 29), Jones asked CO Lervic to call

3

Unit Manager Hicks, a lieutenant or a captain. Lervic said no and told him to talk to a sergeant, to which Jones replied that he tried but was unsuccessful. Jones also showed her the bug bites on his arms, yet Lervic still declined to do anything. About ten minutes later, Jones asked Sgt. Locke about maintenance, and Locke asked him what the Health Services Unit ("HSU") staff gave him, to which Jones apparently responded that he had not seen anyone from HSU. Jones then again asked for a lieutenant, captain or the unit manager. Although Locke also refused this request, he returned to Jones's cell a few minutes later, telling Jones that he had an appointment with the HSU for July 31, 2017, and that he talked to his lieutenant about calling maintenance, since it was again not available at the time.

On the morning of July 31, 2017, Jones spoke with Sgt. Dittman again, telling him that no one had done anything to eliminate the bugs. Jones also showed Dittman his bug bites, and Dittman responded that he would call maintenance. Later that morning, Jones went to the HSU and RN Navarro examined him. Navarro provided him calamine lotion for the bug bites. Jones also asked her to take photographs of the bits, the hallway and his cell, to which Navarro responded that she would do her best. When Jones left the HSU, he saw Unit Manager Hicks and asked him to stop by his cell as well, but Hicks apparently never did so.

At about 11:40 a.m. that same day, Jones asked Sgt. Dittman again about maintenance, and Dittman responded that maintenance was going to provide a mop and water solution for the unit that day. At that time, Jones also received a note from Hicks, who wrote that he is having maintenance spray outside the hallway door three times a day.

4

At about 5 p.m. still that day (July 31), Jones learned that his inmate complaint had been submitted, he was going to receive new linens, and he would be allowed to clean his cell. Jones was dissatisfied, telling Sgt. Jaunke that the disinfectant and glass cleaner would not take care of the bugs. Regardless, Jones did not receive new linen or cleaning equipment that day.

On the morning of August 1, CO 2 Kratz came to Jones's unit and sprayed the hallway door, telling Jones that the unit staff should have used the mop solution available in that unit's bubble. On August 2, Warden Dittman responded to Jones's July 28 letter, writing that (1) maintenance was looking into the bug issue and (2) the unit has taken measures to increase cleaning.

On August 3, Jones spoke with CO 2 Catlin, who told Jones he would be a witness for him. Jones also visited the HSU again on August 4, at which point he did not receive any medication for the itch and his request for photographs was denied. Between July 31 and August 4, Jones further maintains that he asked for other photographs to be taken of his bug bites, and he received responses that his request was forwarded to security. On August 9, however, Jones received a response that security (apparently Weber and Segolowski (*see* Pl. Ex. G (dkt. #1-1) at 10-11) would similarly not take the photographs.

OPINION

Plaintiff seeks leave to proceed against all of the defendants on a Wisconsin law claim related to the refusal of staff to take his pictures, and Eighth Amendment claims

related to the conditions of his confinement, failure to provide medical care for his bug bites and failure to train staff.

## I.    Eighth Amendment Conditions of Confinement

The court begins with plaintiff's claim that his conditions of confinement between July 26 and August 1 amounted to cruel and unusual punishment. To state a claim under the Eighth Amendment regarding conditions of confinement, a plaintiff must allege facts supporting the court objectively finding "sufficiently serious" deprivations that he faced a "substantial risk of serious harm" or was denied "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Additionally, the inmate must allege facts supporting a reasonable trier of fact subjectively finding that the prison official acted with the requisite, culpable state of mind, known as "deliberate indifference" -- that is, the official knew about a risk of harm, had the ability to prevent the harm, and failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).

Without discounting the ongoing annoyance that putting up with biting bugs caused him for a week or more, even construing his allegations generously, plaintiff has failed to allege facts supporting an inference that he objectively faced a "substantial risk of serious harm" or that he was denied "the minimal civilized measure of life's necessities." In particular, plaintiff has alleged that he was bitten on his arms and received medical care for those bites, and that various Columbia staff were shown his bites and noticed the bugs in the hallway and his cell, but the timeline from when he first noticed the bugs on July 26 to August 1 when staff cleaned his hallway and cell was seven days. This time frame is

6

much shorter than those recognized by the Court of Appeals for the Seventh Circuit as posing a substantial risk of serious harm. *See Sain v. Wood*, 512 F.3d 886, (7th Cir. 2008) (while unpleasant, allegation of cockroach infestation spanning six years, including being bitten twice, did not constitute a constitutional violation);*White v. Monohan*, No. 08-2567, 326 Fed. Appx. 385, 388, 2009 WL 1034265, at *3 (7th Cir. Apr. 17, 2009) (reversing district court's dismissal of plaintiff's conditions of confinement claim where the plaintiff alleged that "for over five years the 'bugs, roaches, spiders, wasps, [and] bees' had bitten and stung him so often as to leave multiple scars, wounds, and sores, causing him internal injuries"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (finding that sixteen month infestation of cockroaches and mice was sufficient to state a claim). Not to put too fine a point on it, but what plaintiff alleges could also describe one to two weeks of camping in Wisconsin. Accordingly, plaintiff may not proceed against any of the defendants on an Eighth Amendment conditions of confinement claim.

## II. Eighth Amendment Deliberate Indifference

Plaintiff also seeks to proceed on an Eighth Amendment claim on a theory of deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). "Serious medical needs" include: (1) life-threatening conditions or those carrying a risk of permanent serious impairment if left untreated, (2) withholding of medical care that results in needless pain and suffering, or (3) conditions that have been "diagnosed by a physician as mandating treatment." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997).

Again, construing plaintiff's allegations generously, however, he may not proceed on this theory against any of the named defendants, since plaintiff's description of his bug bites does not support a reasonable inference that he was suffering from a serious medical need. Indeed, courts are reluctant to conclude that, absent other circumstances worsening the condition, an uncomfortable skin issue that responds to treatment is an objectively serious medical need. *Robinson v. Milwaukee Secure Detention Facility*, No. 15-C-263, 2019 WL 3620770, at *2 (E.D. Wis. June 29, 2016) ("Absent any allegation that the itching and bites were severe or anything out of the ordinary, an itch from insect bites does not rise to the level of harm necessary to demonstrate unconstitutional conditions of confinement.") (citing *Holden v. Knight*, No. 3:15-cv-432 JD, 2016 WL 696088, at *3 (N.D. Ind. Feb. 22, 2016) (collecting cases) ("it does not appear as though Holden's skin rash, which is allegedly itchy and has 'hot spots,' can be considered an objectively serious medical condition. Typically, without more, skin rashes are not."); *Smith v. Schwartz*, No. 10-721-GPM, 2011 WL 2115831, at *3 (S.D. Ill. May 26, 2011) ("Smith's allegations that he suffered chronic itching, athlete's foot, chafing, peeling skin, and a painful, infected rash on his buttocks due to an inability to shower and clean his cell . . . do not show a serious medical condition."); *see also Robinson v. Milwaukee Secure Det. Facility*, No. 15-c-263, 2016 WL 3620770, at *2 (E.D. Wis. June 29, 2016) (granting defendants' motion for summary judgment because plaintiff's itchy bedbug bites that were relieved by hydrocortisone cream were not a serious medical condition).

Moreover, defendant Navarro's decision to provide him with calamine lotion does not support an inference of deliberate indifference. Indeed, while plaintiff may have

complained that the lotion treated other conditions, plaintiff concedes that Navarro explained the lotion would help with the itching caused by the bug bites, and plaintiff did not allege any other symptoms that went unaddressed.  While plaintiff alleges that the HSU did not give him more lotion when he requested it, he had not alleged that *Navarro* was responsible for that denial, nor that the bites or itching continued beyond that second HSU visit.  Accordingly, plaintiff may not proceed on any claim against Navarro, who will be dismissed.

Next, plaintiff may not proceed on a failure to train theory against Warden Dittman.  To proceed on a claim based on failure to train, plaintiff would have to allege facts suggesting that (1) Dittman was responsible for training Columbia staff on how quickly to address bug infestations, (2) he knew that his failure to train them would likely lead to a constitutional violation, and (3) he nevertheless failed to take reasonable steps to train the officers. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002).  Here, even assuming that Dittman was responsible for training staff, plaintiff's allegations indicate that Dittman followed up with unit staff about Jones's reported bug problem, and that Jones's unit staff started cleaning the unit more effectively as of August 1.  Since plaintiff does not allege that the bug problem persisted despite the increase in cleanings and providing Jones access to cleaning materials on August 1, it would be unreasonable to infer that Warden Dittman failed to take appropriate action after learning about the bug problem in plaintiff's hallway.  Accordingly, plaintiff may not proceed on a failure to train theory, and Dittman will be dismissed as well.

### III.    Claim Related to Photographs

Finally, plaintiff may not proceed on his claim related to security officials' refusal to take photographs of his bug bites, at least as currently pleaded.  While it is unclear what type of state law claim plaintiff would like to pursue related to the photographs, these allegations could be construed as raising a claim under plaintiff's constitutional right to access the courts.  *See Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) ("The First and Fourteenth Amendments protect the rights of individuals to seek legal redress for claims that have a reasonable basis in law and fact.  Interference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983.") (citations omitted). However, to state an access to courts claim, the plaintiff must allege facts from which an inference can be drawn of "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  At minimum, the plaintiff must at least allege facts showing that the "blockage prevented him from litigating a nonfrivolous case."  *Walters v. Edgar*, 163 F.3d 430, 433-34 (7th Cir. 1998).

Here, even assuming that Weber and Segolowski prevented him from preserving evidence, plaintiff's bug bites (at least as currently described) do not implicate his constitutional rights for reasons addressed above.  Regardless, plaintiff received treatment for the bites.  Accordingly, the absence of photographs of those bites is of immaterial, and plaintiff has failed to state an access to courts claim related to his inability to take photographs of his bug bites.

ORDER

IT IS ORDERED that:

1.  Plaintiff Damont'a Jones' motions for expedited screening (dkt. ##14, 15) are DENIED as moot.

2.  Plaintiff is DENIED leave to proceed on any claim in this lawsuit, and this case is DISMISSED for failure to state a claim upon which relief can be granted. Plaintiff's state law claim is dismissed without prejudice.

Entered this 15th day of January, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge